STATE of Wisconsin, Plaintiff-Respondent,

v.

Michael D. BELOW, Defendant-Appellant.†

Court of Appeals

*No. 2010AP798–CR. Submitted on Briefs December 16, 2010
—Decided April 27, 2011.*

2011 WI App 64

(Also reported in 799 N.W.2d 95.)

† Petition for Review denied 9/11/11.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Joseph L. Sommers*, Oregon.

On behalf of the plaintiff-respondent,the cause was submitted on the brief of *Daniel J. O'Brien*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Neubauer, P.J., Anderson and Reilly, JJ.

¶ 1. ANDERSON, J.   Michael D. Below appeals from a judgment of conviction for first-degree reckless homicide and physical abuse of a child arising out of the August 2008 abuse which led to the death of his infant daughter, Madison. He argues that the trial court erred in denying his motion for an intervening cause instruction. We disagree. The evidence showing that Below's actions were a substantial factor in Madison's death is sufficient to support the jury's verdict. Additionally, the trial court's decision to deny Below's requested jury instruction was not an erroneous exercise of discretion. We affirm.

## Standard of Review

¶ 2.   In reviewing the sufficiency of the evidence to support a conviction, an appellate court may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force

that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990). If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, an appellate court may not overturn a verdict even if it believes that the trier of fact should not have found guilt based on the evidence before it. *Id.*

¶ 3.  We will not sit as a jury making findings of fact and applying the hypothesis of innocence rule de novo to the evidence presented at trial:   "It is not the role of an appellate court to do that." *Id.* at 505–06; *see also State v. Watkins*, 2002 WI 101, ¶ 77, 255 Wis. 2d 265, 647 N.W.2d 244. Indeed, we will only substitute our judgment for that of the trier of fact when the fact finder relied upon evidence that was inherently or patently incredible—that kind of evidence which conflicts with the laws of nature or with fully established or conceded facts. *State v. Tarantino*, 157 Wis. 2d 199, 218, 458 N.W.2d 582 (Ct. App. 1990).

¶ 4.  Additionally, the trier of fact is the sole arbiter of the credibility of witnesses and alone is charged with the duty of weighing the evidence. *See Poellinger*, 153 Wis. 2d at 506. When more than one inference can reasonably be drawn from the evidence, the inference which supports the trier of fact's verdict must be the one followed on review unless the evidence is incredible as a matter of law. *See State v. Allbaugh*, 148 Wis. 2d 807, 809, 436 N.W.2d 898 (Ct. App. 1989). It is exclusively within the trier of fact's province to decide which evidence is worthy of belief, which is not, and to resolve any conflicts in the evidence. *Id.* at 810. The standard

for review is the same whether the verdict is based on direct or circumstantial evidence. *Id.*

### First-Degree Reckless Homicide

¶ 5.  A person is guilty of first-degree reckless homicide when he or she "recklessly causes the death of another human being under circumstances which show utter disregard for human life." WIS. STAT. § 940.02(1) (2009–10).[1] There are three elements to this offense:  (1) the defendant caused the victim's death, (2) he or she did so by criminally reckless conduct, and (3) the circumstances of the defendant's conduct showed utter disregard for human life. WIS JI—CRIMINAL 1020.

¶ 6.  A person engages in "criminal recklessness" if his or her actions create an "unreasonable and substantial risk of death or great bodily harm" to another and the actor was aware that his or her conduct created such a risk. WIS. STAT. § 939.24(1). Thus, the recklessness element requires both the creation of an objectively unreasonable and substantial risk of human death or great bodily harm and the actor's subjective awareness of that risk. *See* WIS. STAT. ANN. § 939.24, Judicial Council Committee Note, 1987 S.B. 191 (West 2011).

### Facts

¶ 7.  The facts are not in dispute. Madison Below died on August 23, 2008. Twelve days earlier, on August 11, Madison was brought to St. Joseph's Hospital emergency room and treated by Dr. Mary Lewis. Lewis

---

[1] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

testified that Madison had severe injuries to the entire brain, a skull fracture and bleeding around her eyes. Lewis determined that Madison's brain injuries were irreversible. Because of the severity of the injuries, Lewis transferred Madison to Children's Hospital of Wisconsin.

¶ 8.  At Children's Hospital, Madison was examined by Dr. Thomas Valvano. In addition to her severe brain injury, Valvano discovered that Madison had healing rib fractures on both sides of her rib cage indicating prior abuse. Valvano learned from Madison's parents—Below and Michelle Hugg—that two to three weeks earlier, Madison was admitted to the hospital for a bruised or swollen upper lip. Below said Madison had fallen forward and bumped her mouth on the television remote. Below also said a couple weeks before she was admitted, Madison's left temple was injured when Madison bumped her head against the diaper wipes container. Below said he noticed another bruise on Madison's forehead a couple days before she was admitted and he thought it was from Madison bumping her forehead against his ring. In addition, Madison had breaking blood vessels in the whites of both eyes and Below said he noticed this about a week before her admission.

¶ 9.  Valvano testified that when he first examined Madison, she had already been put in intensive care, intubated, and placed on a ventilator. He described Madison's "severe brain injury" as "so devastating, so complete." He testified that both cerebral hemispheres of Madison's brain were severely injured and massive swelling blocked blood flow to the brain. Madison had significant cerebral edema throughout the entire brain and a significant loss of normal gray/white matter distinction—loss of which is referred to as "black brain."

Madison's "fixed" pupils were "just another sign of the progression of the brain injury." Madison's "complex skull fracture" covering both sides of her head was indicative of a significant force to the brain, rather than a simple single impact from a fall. Finally, Valvano determined that Madison had "an overwhelming and irreversible brain injury" which he understood to be "ultimately why she died."

¶ 10. West Bend Detective Robert Lloyd testified that he was called into St. Joseph's hospital on August 11, 2008, to investigate a suspected child abuse complaint. At the hospital, Lloyd made contact with Below, who agreed to come to the police department to answer questions. After giving Below his *Miranda*[2] rights, Lloyd questioned him, asking if he could remember any incidents where Madison had hurt herself which would have led to her injuries. Below described four separate injury-causing incidents he characterized as accidents, but said they occurred two weeks to one month ago. Below then insisted that the day before was uneventful, that Michelle went to work and he cared for Madison from about 5:40 p.m. until about 9:30 p.m. The interview concluded.

¶ 11. Soon after, when they were back at Children's Hospital, Below approached Lloyd and changed his story about what happened the day before admitting Madison. Below told Lloyd that the day before he had accidentally dropped Madison. He gave a written statement to that effect.

¶ 12. Below's story changed again later that day when Lloyd and Lieutenant Richard Lucka conducted another interview at the police station. Below told the officers that he might have "pushed" Madison "faster to

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

the floor" while trying to catch her when she fell. He picked up Madison and held her with his left hand against the left side of his chest. He said his hand "ha[s] a lot of strength" so he thought it was possible that he may have squeezed Madison's head too hard when he was trying to get her to stop crying. When he laid Madison back down on the changing table, he noticed a red spot on her head; he thought it was either from her fall or from his own thumb.

¶ 13. At this point in the interview, the officers left the room to call Valvano at Children's Hospital. Valvano told the officers "it was not possible" that Madison's injuries were caused by the incident as described by Below. The officers then informed Below that Madison's doctor said it was not possible that her injuries resulted from what he described. Upon hearing this, Below changed his story yet again, saying that maybe Madison hit her head on the changing table. The officers brought Below a doll and asked him to elaborate and demonstrate what he meant. Below picked up the doll—which represented Madison—and held it upside down with its feet between his thumb, index and middle fingers. He lifted the doll up about a foot from the interview table—which represented the changing table—and struck its head on the table, after which he laid the doll on its back and slid the doll's head three times into the wall—which represented the sides of the changing table.

¶ 14. After Below's demonstration of how he repeatedly struck Madison's head on the changing table, the officers asked for and Below agreed to give another written statement. In the statement, Below revealed more details. He reiterated that Madison had fallen to the floor and that he tried to quiet her crying by holding her head with his left hand against his chest. He said

698

after ten to fifteen minutes of crying he laid her on the changing table and "she started getting really fussy and fighting with her legs." He said he got "frustrated" and picked her up by her feet with one hand, her head was about one foot above the changing table and he "pushed Madison down on the changing table very hard. I could hear her head hit the table. I picked her up and did it again a couple of times." On a scale of one to ten, with ten being the hardest impact, he said he "hit Madison's head on the changing table about 8 to 9." He said he "just lost control and was frustrated." Finally, Below said with regard to Madison's older injuries he "may have caused [Madison's] fractured ribs."

¶ 15.  On August 13, 2008, a criminal complaint was filed charging Below with two counts of physical abuse of a child as a repeater, count one included intentionally causing great bodily harm to a child. The next day, August 14, Below wrote a letter to Hugg telling her, "I can't believe what I did myself to [Madison]." He admitted that he "went crazy from all the shit that has gone on."

¶ 16.  A week after Madison's admission to Children's Hospital, on August 18, 2008, a meeting was called by the medical staff to update Madison's family on her condition. Thereafter, one of the physicians reported that the "family decided, after asking very appropriate questions, not to reintubate or use any resuscitative measures should Madison fail extubation. She was then extubated and did well afterwards . . . . She continued on her comfort medications." Madison died five days after extubation on August 23, 2008.

¶ 17.  About one week after Madison's death, Below wrote another letter to Hugg admitting, "I just couldn't control my rage and believe you me I hate myself for what I did to my little girl." The next day, again by letter

to Hugg, Below admitted, "I lost control and took [Madison's] life with my actions." Finally, in a letter to Hugg dated September 5, Below admitted, "It was my actions th[at] lead [sic] to [Madison's] death and I'll never forgive myself for it. [Madison] was our Flesh and Blood and I let my worry and depression and anger get out of control."

¶ 18. Waukesha county medical examiner and forensic pathologist, Dr. Linda Biedrzycki, performed Madison's autopsy. She testified that "Madison Below died as a result of blunt head trauma." Biedrzycki said her most significant finding in determining how Madison's injury occurred was the "striking" finding she made of a "very large, complex skull fracture." Madison's skull fracture and a fracture to her femur were consistent with the time of the August 11 admission. However, rib fractures were consistent with injury occurring about ten days to two weeks before the August 11 admission. Associated with Madison's large skull fracture were other levels of injury inside her head, which included bleeding over the surface of the brain (subdural hemorrhaging), bleeding closer to the surface of the brain (subarachnoid hemorrhaging) and bruising to the brain (cerebral contusions). These injuries caused a "cascade of other events": brain swelling and thrombosis of Madison's veins in her head, as well as bruising above her eyes, nose, and right and left temporal areas. "'These bruises, because of their location and symmetry, were caused when [Madison's] brain inside [her] head hit the ridges of [her] skull. So when [her] skull was impacted causing the large fracture . . . that transmitted energy to the very soft brain, which then hit the inside of the skull and caused those bruises." Biedrzycki further explained that after a brain injury of this sort, an "unstoppable chain of events" occurs.

So I guess this is like a story. You get the injury and then it starts this sequence of horrible events in the brain that just go on and on. And more brain dies and more brain dies, and it's—it is like an unstoppable chain of events.

¶ 19. Additionally, Biedrzycki testified that Madison's skull and brain injury was "[a]bsolutely" the ultimate cause of death and could not have been caused by the removal of life support or medical intervention. She further explained that the decision to not give water or food was "[a]bsolutely not" a proximate cause of Madison's death because the proximate cause of death is the injury or disease that starts the chain of events that leads to the physiologic derangements that cause death: "Things started with the head injury. That's what caused irreversible brain damage; terminal brain damage you might say. Palliative care was part of the therapy of that chain of events that started with the injury."

¶ 20. Washington county medical examiner, Kelly McAndrews, observed the autopsy and listed in the death certificate Madison's cause of death to be "sustained blunt trauma to the head at the hands of another."

¶ 21. Ophthalmic pathologist, Dr. Daniel Albert, examined Madison's body and testified that the severe hemorrhaging and retinal folds in both of Madison's eyes are "extremely suggestive" of "non-accidental head injury" not consistent with a short fall.

¶ 22. On August 25, 2008, an amended criminal complaint charged Below with first-degree reckless homicide and physical abuse of a child. Thereafter, Below filed a motion to instruct on intervening cause. He requested that the jury be told "that the termination of life support, on these unique facts, may be, if the jury

701

so decides, an intervening cause of death that relieves Michael Below from responsibility of the death of Madison Below." Below's motion also sought an order permitting him to present evidence that the termination of life support for Madison did not conform to applicable Wisconsin law.

¶ 23. The trial court denied the motion in its entirety explaining that even if an intervening act is legally wrongful, if the State meets its burden of proof, that wrongful act will not break the chain of causation between Below's actions and Madison's death:

> Whether the acts constitute medical malpractice or are otherwise "legally wrongful" the analysis is the same. The State must still prove beyond a reasonable doubt that the Defendant's acts were a substantial factor in producing [Madison's] death . . . . [E]ven if the Defendant can establish that the termination of Madison's life support was "wrongful" under Wisconsin Law, that wrongful act would not break the chain of causation between the Defendant's actions and Madison's subsequent death.

¶ 24. Below filed an interlocutory appeal with this court, which we denied. The case proceeded to trial. At the close of evidence, the trial court again denied Below's request for an intervening cause instruction. It instructed the jury in accordance with pattern instruction WIS JI—CRIMINAL 1020 that the element of "cause" for reckless homicide is established if the jury finds beyond a reasonable doubt Below's conduct was a "substantial factor" in bringing about the child's death. The court denied Below's motion to dismiss for insufficient evidence. The jury found Below guilty of one count of first-degree reckless homicide and one count of physical abuse of a child. The trial court entered the judgment of conviction accordingly. Below appeals.

¶ 25. On appeal, Below challenges the trial court's denial of his request for an intervening cause instruction. He contends that there was not sufficient evidence at trial to convict him of first-degree reckless homicide given the undisputed evidence that Madison's life support was withdrawn without her being diagnosed as "in a persistent vegetative state."

## Discussion and Law

¶ 26. The trial court's decision to deny the intervening cause of death instruction was not clearly erroneous. We are satisfied that the overwhelming medical and other evidence viewed most favorably to the State and the conviction is sufficient to show that Below's undisputed intentional actions—his repeated striking of Madison's head against the changing table—were a substantial factor in causing Madison's death. That is the showing required under Wisconsin law and the State proved it beyond a reasonable doubt. *See State v. Oimen*, 184 Wis. 2d 423, 435, 516 N.W.2d 399 (1994); *see also Cranmore v. State*, 85 Wis. 2d 722, 771–75, 271 N.W.2d 402 (Ct. App. 1978); *State v. Serebin*, 119 Wis. 2d 837, 846–47, 350 N.W.2d 65 (1984); *State v. Glenn*, 190 Wis. 2d 155, 168, 526 N.W.2d 752 (Ct. App. 1994); *State v. Block*, 170 Wis. 2d 676, 682–84, 489 N.W.2d 715 (Ct. App. 1992).

¶ 27. Below cannot avoid the teachings of relevant Wisconsin jurisprudence. And we are bound by precedent. *See Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997). In Wisconsin criminal law, the term "causes" has a consistent, well-established meaning. *Oimen*, 184 Wis. 2d at 435. An actor causes death if his

or her conduct is a "substantial factor" in bringing about that result. *Id.*; *Serebin*, 119 Wis. 2d at 846–47; *Cranmore*, 85 Wis. 2d at 775.[3] What is more, "[a] 'substantial factor' *need not be the sole cause of death*" for one to be held legally culpable. *Oimen*, 184 Wis. 2d at 436 (emphasis added).

¶ 28. *Cranmore* is particularly instructive. In *Cranmore*, three defendants were convicted of first-degree murder after shooting an off-duty police officer. *Cranmore*, 85 Wis. 2d at 728, 730. On appeal, the defendants argued that the jury could reasonably have concluded that the death of the officer was caused by the actions of his attending physicians in performing a nephrectomy (removal of kidneys) and in discontinuing the respirator and the administration of drugs to maintain blood pressure. *Id.* at 771. The defendants argued that it was reversible error not to instruct the jury on the question of what constitutes death or when it can be said to occur, as was requested by the defendants. *Id.* The State maintained that the question of when death occurs is irrelevant and that its burden was met in proving the gunshot wound inflicted by the defendants was a "substantial factor in producing death." *Id.* at 772. The State asserted that the defendants could not be relieved of their liability for the death of the officer unless the subsequent actions of the attending physicians could be found to be the sole cause of death. *Id.*

---

[3] *See also* Walter Dickey, David Schultz and James L. Fullin, Jr., *The Importance of Clarity in the Law of Homicide: The Wisconsin Revision*, 1989 Wis. L. Rev. 1323, 1329 (setting forth the "substantial factor" test for causation and stating that definitions of causation generally remain constant from one degree of homicide to another and throughout the criminal code).

¶ 29.   We agreed with the State. We held that we needed only to determine whether the jury could reasonably be convinced from the evidence which it had a right to believe and accept as true that the defendants were responsible for the death of the officer. *Id.* at 774. We noted that there was "competent evidence from which the jury could conclude, according to a common law theory of death (blood circulation and pulmonary activity), or according to the 'brain death theory,' that death occurred before the nephrectomy." *Id.* The evidence was sufficient to establish cause of death beyond a reasonable doubt. *Id.*

¶ 30.   We explained that "the jury was not required to find, nor was the state required to prove, that [the officer] was dead prior to the performance of the nephrectomy." *Id.* Significantly, we then clarified that "[e]ven were we to find that the attending physicians were negligent in believing that the officer was dead and that their negligence contributed to his death, *this would not break the chain of causation between the defendants' acts and the consequent death." Id.* at 774–75 (emphasis added). Again, the State is only required to prove beyond a reasonable doubt that the defendants' acts were a substantial factor in producing the death. *See id.* at 775; *see also* Wis JI—Criminal 1020. Thus, noting that it was proved beyond any possible doubt that the acts of the defendants were a substantial factor in producing the officer's death, we reiterated our holding that a finding on our part of negligence by the physicians "would be insufficient to relieve the defendants of responsibility for the death." *Cranmore,* 85 Wis. 2d at 775.

¶ 31.   Below attempts to distinguish his case from *Cranmore* pointing to the fact that in Madison's death, unlike in the officer's, the intervening act was indisput-

705

ably intentional and arguably illegal. We are hard pressed to understand why Below contends that the categorization of the intervening act has *any* significance. Indeed, in *Cranmore* we determined that the intervening act's categorization was so immaterial to our determination that it was left undecided. *See id.* at 775. Furthermore, we made clear that even if we had categorized the intervening act as negligent, this fact *would not be sufficient to relieve a defendant of his or her culpability* when it is proved beyond a reasonable doubt that the defendant's acts were a substantial factor in producing the death. *See id.*

¶ 32. Below disavows the relevance of the controlling authority and looks to noncontrolling case law for support. Citing a court of appeals decision out of New York, Below opines how "unfair" it is to hold him responsible for Madison's death:

> [W]rongly terminating life support is the type of purposeful conduct that is not foreseeable by the initial actor, and distinguishes [Below's] facts from those in *Cranmore*[, 85 Wis. 2d at 771–75]. While Below's acts exposed his daughter to numerous medical procedures, with their predictable and attendant risks, it is unfair to hold him responsible for the withdrawal of medical treatment that purposely terminated her life.

Again, Below does not contend that the State failed to prove he repeatedly struck his daughter's head against the changing table, causing her to suffer from severe skull injuries and irreversible brain damage. Rather, he argues that the State failed to prove his reckless conduct was a substantial factor in bringing about Madison's death. As we have clarified, the controlling law not only does not support Below's argument, it levels it.

¶ 33. Under Wisconsin law, whether the intervening act was negligent, intentional and/or legally wrongful is irrelevant. The analysis is the same. The State must still prove beyond a reasonable doubt that the defendant's acts were a substantial factor in producing the death. Therefore, the trial court's denial of Below's motion, including the intervening cause instruction, was altogether proper. Even if Below could have established that the termination of Madison's life support was "wrongful" under Wisconsin law, that wrongful act would not break the chain of causation between Below's actions and Madison's subsequent death. We are satisfied that the trial court's well-reasoned decision to deny the motion was based on the law. Moreover, the overwhelming evidence supports the jury's finding beyond a reasonable doubt what the State successfully proved:  Below's actions were a substantial factor in causing Madison's death.

*By the Court.*—Judgment affirmed.