COURT OF APPEALS
DECISION
DATED AND FILED

January 11, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1347-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF614

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

CHRISTY ROSE TUCHEL,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Sheboygan County: L. EDWARD STENGEL, Judge. *Affirmed*.

Before Gundrum, P.J., Grogan and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Christy Rose Tuchel appeals a judgment of conviction entered on jury verdicts finding her guilty of causing mental harm to a child contrary to WIS. STAT. § 948.04 (2019-20),[1] mistreatment of animals causing death as a party to a crime contrary to WIS. STAT. § 951.02, and twenty-four counts of failing to provide sufficient food or water for animals in her care as a party to a crime contrary to WIS. STAT. § 951.13. She also appeals an order denying her postconviction motion. She raises a plethora of challenges to her convictions, asserting: (1) the presiding judge should have been statutorily disqualified; (2) law enforcement violated her due process rights by destroying apparently exculpatory evidence; (3) her prosecutions under § 951.13 were unconstitutional; (4) a forensic interview of a minor was improperly admitted at trial; (5) various instances of ineffective assistance of trial counsel; and (6) she is entitled to a new trial in the interest of justice. We reject her arguments and affirm.

## BACKGROUND

¶2 Tuchel was the owner of "Kinship Companions LLC," a dog-breeding business that was at one point permitted to keep as many as 75 adult dogs. In early 2015, the Town of Wilson Board of Supervisors decided not to renew Tuchel's conditional use permit. Tuchel thereafter kept dozens of dogs on the property, but according to her postconviction affidavit, she was unable to sell them.

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted. Though the crimes referenced herein took place in 2017, the relevant statutes have not changed. We therefore cite to the most recent version.

¶3      Between 2015 and 2017, several inspections were initiated by law enforcement based on complaints about the treatment of the animals in Tuchel's care. No enforcement action was apparently taken as a result of these inspections, though Tuchel acknowledged that "areas for improvement were discussed." After Tuchel became physically unable to take care of the dogs, her then-fiancé, Anthony Keyport, along with Tuchel's children, including B.M. and J.M., helped her.[2]

¶4      At trial, J.M. testified that when he was thirteen or fourteen years old, he almost exclusively began taking care of the dogs. He testified that though his siblings helped at times, he was doing work "that no one should have to go through." Freezers that once housed raw meat for the dogs became storage containers for dogs that died in their care. J.M. testified Tuchel, Keyport, and B.M. taught him to stuff the dead dogs in two empty dog food bags before throwing them in a freezer. J.M. estimated he placed between twelve and forty deceased dogs in freezers. J.M. continued that "[t]here were so many dogs in there that we had to stack stuff on top of them to keep the doors closed." He testified that Tuchel told him that if he did not dispose of the dogs in this fashion, she would go to jail, the dogs would be taken away, and "[her] life will be over."

¶5      J.M. testified that for a time, the family had pallets of food delivered for the dogs. After he took over as the primary caregiver, the deliveries stopped and J.M. had to get food from Wal-Mart. According to J.M., a flood in early 2016 "is what started the hell." After that time, the dogs would sometimes not be fed

---

[2] Consistent with the policy underlying WIS. STAT. RULE 809.86, we refer to the victim and his siblings using initials. Additionally, we note that J.M. was still a minor at the time of trial.

for days, and Tuchel and B.M. instructed him to ration what little food was available. J.M. testified many of the dogs were thin and had visible hip and rib bones, and when he would pet them he could feel their spines.

¶6 J.M. testified that several dogs in their care died of malnourishment. He provided the names of some of the dogs that died, including "Razor," "Blade," and "Shamus." J.M. testified that the dogs were so thin he could carry four of them like luggage. When asked why he would have to carry them like that, J.M. explained that he would pull an "all nighter" before inspections and hide the most sickly dogs in the garage; at one point, as many as seventeen animals were housed there. When a dog died, he would place the corpse in a freezer, all of which he testified stopped working after the flood. He testified the smell was "the worst possible smell you can imagine."

¶7 In late June 2017, police executed a search warrant after J.M. informed them about conditions at the kennel. The search revealed thirty-six dogs, which were examined briefly before being removed the following day for more thorough examinations. There was only a small pile of food present and virtually no water. Many dogs had unhealthy body scores (a measure of their nourishment), and the veterinarian present surmised that the dogs in better condition were likely the more dominant dogs and were eating the others' food.

¶8 Tuchel was charged with causing mental harm to a child, mistreatment of animals causing death as party to a crime, and thirty-six counts of misdemeanor failing to provide sufficient food and water to animals in her care as party to a crime—one count for each of the live animals discovered during the search. Following a trial, a jury returned guilty verdicts on all but twelve of the misdemeanor counts. Tuchel filed a postconviction motion in which she alleged,

among other things, ineffective assistance of trial counsel. That motion was denied following a **Machner** hearing.[3] Tuchel now appeals.

## DISCUSSION

*I. Judicial Disqualification*

¶9 Citing WIS. STAT. § 757.19(2)(g), Tuchel argues the circuit court judge was required to recuse himself from the proceedings. Tuchel's argument is predicated upon the fact that the judge was previously married to a person interested in the case, Nancy DesJardins. DesJardins was not a party or witness to the case, but was a town board supervisor at the time Tuchel's permit was revoked. There was evidence of considerable hostility between DesJardins and Tuchel, both historically and at the time of trial, which DesJardins attended in the front seating row.

¶10 WISCONSIN STAT. § 757.19(2)(g) "requires disqualification when a judge determines that he or she cannot, or that it appears that he or she cannot, act impartially in a case." **State v. Harrell**, 199 Wis. 2d 654, 663, 546 N.W.2d 115 (1996). Appellate review of this subjective determination is limited to ascertaining, as a matter of law, whether the judge made a determination whether he or she should be disqualified. **Id.** at 663-64.

¶11 Here, the judge clearly made the requisite determination, noting that he and DesJardins were divorced in 1988 and had no contact whatsoever about the

---

[3] *See* **State v. Machner**, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

facts or circumstances of the case.[4]  To the extent Tuchel attempts to raise a due process claim by citing to *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), we reject any such claim as both undeveloped, *see State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992), and unsupported by the facts of record.[5]

## II.  Destruction of Evidence

¶12     Tuchel also contends she suffered a due process violation as a result of the State's destruction of the two freezers containing the remains of dozens of deceased dogs.  Tuchel contends the freezers and their contents were "apparently exculpatory" because the dogs' remains could have been sent for forensic testing regarding the causes of death and because the dog food bags in which the corpses were stuffed may have had expiration dates on them that would have aided in ascertaining which specific dog was in it.[6]  Tuchel also argues the dog corpses

---

[4] This determination was made during postconviction proceedings, and on appeal Tuchel argues her trial counsel was constitutionally ineffective for failing to previously raise the issue. Based upon the circuit court's determination, we conclude there is no possibility of prejudice arising from trial counsel's failure to earlier raise the issue.

[5] The same is true of Tuchel's reference to S.C.R. 60.04(1) (2019).

[6] Tuchel fails to adequately develop arguments surrounding the apparent exculpatory value of the food bags and a small quantity of dog food that was not weighed. The significance of the dates on the food bags is not readily apparent. Tuchel's assertion that the expiration dates might have helped the defense identify specific dogs in the bags is purely speculative; she provides no evidentiary basis for her trial counsel's assertion that it was "possible" the bags could have aided in determining when the dogs had died or were placed in the freezers. Regarding the dog food, Tuchel fails to articulate why it would have been necessary for police to document the specific weight of the food in light of their ability to roughly estimate the amount of food present; for example, Roeseler testified that there was a "small amount, probably a quarter of a … 50-pound bag of Ol' Roy." Tuchel does not, for example, contend that Roeseler materially understated the amount of food recovered.

were necessary because she wanted to "preserve" them to be tested in some way related to a chemical spill that occurred in 2014.

¶13 To establish that the State violated her due process rights by destroying apparently exculpatory evidence, Tuchel must demonstrate: (1) that the evidence destroyed possessed an exculpatory value that was apparent to those who had custody of the evidence before its destruction; and (2) that the evidence was of such a nature that the defendant was unable to obtain comparable evidence by other reasonably available means. *State v. Munford*, 2010 WI App 168, ¶21, 330 Wis. 2d 575, 794 N.W.2d 264. When the facts are undisputed, whether the State failed to preserve evidence in violation of due process is a question of law that this court reviews de novo. *See State v. Luedtke*, 2015 WI 42, ¶37, 362 Wis. 2d 1, 863 N.W.2d 592.

¶14 Tuchel has failed to make the requisite showing. The destruction of the freezers themselves was not constitutionally problematic. At trial, Sheriff Corey Roeseler, who was in charge of the search of the premises, testified that during the investigation he learned that a flood had damaged the freezers and they were not functioning. He testified that "as a safety matter, there was no way I was going to plug them in or have anyone else attempt to plug the freezers in to see if they worked." Even if the freezers could have been safely made operational, the dog corpses were in such a severe state of decomposition—Roeseler referred to them as a "liquid sludge"—that he regarded the freezers as being contaminated with a "possible biohazard material." Tuchel fails to explain why the police should have regarded the freezers as having apparent exculpatory value.

¶15 As for the dog remains, Roeseler testified that he began the search hoping to preserve one or more of the dog corpses for analysis. He acknowledged

7

he was not an expert and testified he was relying on "the Humane Society veterinarian, Dr. Heenan, to guide [him] as to whether or not there was any evidentiary value in any of those deceased and decaying animals." Heenan, in turn, testified the dog corpses were far too decomposed to ascertain a cause of death.[7] In particular, the organs were liquefied, the musculature was so degraded that only bones could be examined, and there was no possibility of confirming infectious disease.

¶16 At best, Tuchel has established only that the freezers and the dog remains were potentially exculpatory.[8] But the destruction of evidence that is only potentially exculpatory must be paired with a showing that law enforcement acted in bad faith by failing to preserve it. *Luedtke*, 362 Wis. 2d 1, ¶39. Tuchel makes no argument in this regard. We therefore conclude Tuchel's due process rights were not violated by the destruction of the freezers or their contents.

---

[7] Tuchel argues "that the deceased dogs in the freezers were exculpatory because Dr. Heenan testified she knew the evidence of freezer contents could have been sent to a forensic pathologist for post-morbidity testing." This is a considerable overstatement of Heenan's testimony. Heenan was asked about the corpse of only one dog, which she testified was "the absolute best case out of the entire two chest freezers." She stated that, though flattened, the dog's skeleton appeared to be intact and could possibly have been sent to a veterinary pathologist for advanced testing, but the level of compression rendered it beyond her skill level to determine a cause of death. Heenan's testimony in this regard hardly establishes that the skeleton had apparent exculpatory value. Additionally, given the state of the deceased dogs, Tuchel's claim that she was attempting to "preserve" key evidence regarding a 2014 chemical spill is specious, at best. Tuchel's assertion that the decomposing dogs could have substantiated her belief that they died as a result of the chemical spill is pure conjecture.

[8] This is true despite Tuchel's claim that the freezer cords could have been fingerprinted in an effort to determine whether J.M. deliberately unplugged them. Other than pure conjecture, she provides no reason why police might have believed the freezer cords would have had apparent exculpatory value. Even Tuchel cannot say for certain whether the cords would have contained J.M.'s fingerprints, making the cords only potentially exculpatory.

### III. Constitutionality of WIS. STAT. § 951.13

¶17    Tuchel argues her convictions under WIS. STAT. § 951.13 are invalid because the statute is unconstitutionally overbroad and vague as applied to her. The constitutionality of a statute is a question of law that we review de novo. *State v. Wood*, 2010 WI 17, ¶15, 323 Wis. 2d 321, 780 N.W.2d 63.  In an as-applied challenge, we "assess the merits of the challenge by considering the facts of the particular case in front of us," determining whether the individual has demonstrated a violation of his or her constitutional rights. *Id.*, ¶13.

¶18    Both overbreadth and vagueness doctrines analyze the adequacy of the statutory language establishing the proscribed conduct.  A statute is overbroad when its language, given its normal meaning, is so sweeping that its sanctions may be applied to constitutionally protected conduct for which regulation is not permitted.  *Brandmiller v. Arreola*, 199 Wis. 2d 528, 546, 544 N.W.2d 894 (1996).  A statute is void for vagueness if it "does not provide 'fair notice' of the prohibited conduct and also provide an objective standard for enforcement of violations."  *State v. Ruesch*, 214 Wis. 2d 548, 561, 571 N.W.2d 898 (Ct. App. 1997).  In both cases, Tuchel bears the burden of demonstrating that the statute is unconstitutional beyond a reasonable doubt. *See id.* at 556.

¶19    Tuchel fails to demonstrate that WIS. STAT. § 951.13 is either overbroad or vague.  She does not differentiate between the two analyses; rather, she essentially argues that the evidence establishes her innocence because, in her view, she gave enough food and water to keep the animals healthy as required by

9

WIS. STAT. § 951.13.[9]   She faults the legislature for not more specifically describing what "good health" consists of, asserting that it should have set standards for health based on urinalysis and blood testing.   Moreover, she argues the dogs did not require emergency medical care given that they were not removed until the day after the start of the search, and she faults the prosecutor for introducing "irrelevant" evidence to inflame the jury, including evidence of the dogs' matted hair, ear infections, and tartar buildup on teeth, as well as evidence that the dogs were fed low-quality food.[10]

¶20   At the end of the day, Tuchel's constitutional claims appear designed more to castigate the State for its evidentiary presentation than to demonstrate the illegality of her prosecution.   Tuchel fails to identify any constitutionally protected conduct upon which WIS. STAT. § 951.13(1) intrudes.   We therefore deem her overbreadth challenge undeveloped.   *See Pettit*, 171 Wis. 2d at 646.   Indeed, Tuchel all but abandons her overbreadth claim in her reply brief.

¶21   As for vagueness, the test does not ask whether the legislature could have more specifically defined the prohibited conduct.   *See State v. Hurd*, 135 Wis. 2d 266, 272, 400 N.W.2d 42 (Ct. App. 1986) (observing that a statute "need

---

[9] WISCONSIN STAT. § 951.13(1) directs that the food provided to animals in a person's care must be "sufficient to maintain all animals in good health."   Subsection (2) directs that potable water must be accessible to animals at all times or else it shall be "provided daily and in sufficient quantity for the health of the animal."

To the extent Tuchel intends by her constitutional claims to challenge the sufficiency of the evidence supporting her convictions under WIS. STAT. § 951.13, we deem any such argument undeveloped.   *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

[10] Though Tuchel's arguments in this regard are misdirected for the reasons set forth below, we note that some of the evidentiary matters Tuchel relies on are plainly relevant to whether the dogs were in good health as a result of Tuchel's provision (or lack thereof) of food and water.

not define with absolute clarity and precision what is and what is not unlawful conduct."). The statute here adequately informs people wishing to obey the law that their conduct comes near a proscribed area when their intentional or negligent failure to provide food and water to an animal in their care imperils the animal's health. *See State v. Nelson*, 2006 WI App 124, ¶36, 294 Wis. 2d 578, 718 N.W.2d 168. Regarding enforcement, contrary to Tuchel's claim, the term "health" is sufficient given the proscribed conduct (i.e., failure to provide sufficient food and water) to permit an objective determination of guilt without requiring a trier of fact to supply its own standards of culpability rather than those set out in the statute. *See id.*, ¶37.

¶22 Finally, though apparently not anchored to her overbreadth or vagueness claims, Tuchel argues the prosecutor misled the jury by "add[ing] up the dead dogs in the freezers and unsubstantiated claims of dead dogs buried in fields to arrive at 36 dogs" to support charges under WIS. STAT. § 951.13. Tuchel ignores that the freezer evidence was relevant because she was not merely charged with failing to provide food and water, but also with causing harm to a child and mistreatment of an animal causing death. And she also fails to recognize that the mistreatment contemplated under § 951.13 does not depend on whether (or why) animals were immediately removed from her care upon execution of the search warrant.

¶23 The State's theory was that J.M.'s testimony established that Tuchel was a conspirator involved in the chronic mistreatment of the animals at the kennel. In discussing the evidence, the prosecutor argued at closing:

> You're not feeding the animals on a regular basis and what
> they need, they're going to die.

> They had multiple deaths. Freezers of 31 dogs plus because you couldn't tell how many more were there and at least four to six occasions of burying one to 16 dogs in the ground.

The prosecutor argued that Tuchel must have been aware of the conditions at the kennel because, among other things, she directed which dogs would be hidden when inspections occurred. The prosecutor continued this line of argument by noting that "now we're left with the final counts, [t]he 36 living dogs," which were not supplied with adequate food or water. And when discussing the concept of "good health," the prosecutor noted that however that term was defined, it did not include being dead, being too sickly to bear scrutiny in an inspection, and being designated as malnourished by a veterinarian.

¶24 To the extent the prosecutor's comments could be construed as suggesting that the dead dogs in the freezers supported the WIS. STAT. § 951.13 charges, Tuchel has not established a basis for relief. The jury was properly instructed that the arguments of counsel do not constitute evidence. In any event, the prosecutor, at the conclusion of the State's argument, identified by name the dogs were alleged to have been malnourished.[11] The verdict forms, too, used these names. And, in what can only be construed as an acknowledgment of the weakness of the State's case as to certain animals, the jury ultimately acquitted Tuchel of some of the malnourishment charges. In short, Tuchel has not demonstrated error despite her efforts to back-door challenges to the admissibility of evidence through her constitutional claims.

---

[11] Tuchel argues the State inflamed the jury by giving the dogs "[c]ute made-up dog names" rather than identifying the dogs by an alphabet letter or a number. Tuchel cites no law in support of this argument and we deem it undeveloped. *See **Pettit***, 171 Wis. 2d at 646.

*IV.  Admissibility of R.M.'s Forensic Interview*

¶25     Next, Tuchel argues the State improperly impeached R.M., Tuchel's daughter, with a recording of a forensic interview connected to a CHIPS proceeding.  The State concedes that, if the interview recording was a record of the CHIPS court, the State would have been required to petition the court exercising juvenile jurisdiction for an order releasing the interview recording under WIS. STAT. § 48.396 and *State v. Bellows*, 218 Wis. 2d 614, 582 N.W.2d 53 (Ct. App. 1998).

¶26     The State, however, notes that the circuit court rejected Tuchel's argument that the interview recording constituted a CHIPS record.  The court concluded the recording was not subject to *Bellows* because the interview was conducted to obtain information for both a criminal investigation and in connection to the CHIPS matter.  Moreover, the court concluded that any error in the admission of the interview recording was harmless.  *See* WIS. STAT. § 805.18(2).

¶27     As the State points out, Tuchel wholly fails to engage with the circuit court's analysis.  Her argument that the State failed to obtain permission from the juvenile court to use R.M.'s interview recording merely assumes that such permission was necessary, ignoring the circuit court's rationale to the contrary.  She does not address in any fashion the court's harmless error conclusion.  And finally, her reply brief contains no response even after the State pointed out these deficiencies.  For these reasons, we deem Tuchel's argument regarding the admissibility of R.M.'s interview recording both undeveloped, *see Pettit*, 171 Wis. 2d at 646, and forfeited, *see Charolais Breeding Ranches, Ltd. v. FPC Secs. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979).

## V. *Ineffective Assistance of Trial Counsel*

¶28    Tuchel additionally raises a multitude of ineffective assistance of counsel claims.[12]   The Sixth Amendment guarantees a defendant the effective assistance of counsel.  *State v. Savage*, 2020 WI 93, ¶27, 395 Wis. 2d 1, 951 N.W.2d 838.   To prevail on an ineffective assistance claim, the defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant.  *Id.*; *see also* *Strickland v. Washington*, 466 U.S. 668, 687 (1984).   We review an ineffective assistance of counsel claim using a mixed standard of review.  *Id.*, ¶25.   The circuit court's factual findings, including those regarding trial counsel's conduct and strategy, will not be overturned unless they are clearly erroneous, but we review de novo whether counsel's conduct constitutes constitutionally ineffective assistance.  *Id.*   If the defendant fails to establish either prong, we need not address the other.  *Id.*

¶29    To demonstrate deficient performance, the defendant must show that his or her attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Id.*, ¶28.   We presume that counsel's conduct fell within the wide range of reasonable professional assistance, and we will grant relief only upon a showing that counsel's performance was objectively unreasonable under the circumstances.  *Id.*   Prejudice is demonstrated by showing a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceeding would have been different.  *Id.*, ¶32.

___

[12]  We have previously addressed certain aspects of two of Tuchel's ineffective assistance of counsel claims—that her trial counsel failed to seek judicial disqualification and failed to explain that Tuchel was preserving dead dogs in the freezers in the hopes to have them tested for any effects from the 2014 chemical spill.  For the reasons set forth previously, *see infra*, ¶¶9-11, 15 n.7, we conclude these ineffective assistance claims fail.

### A. Conflict of Interest

¶30    Tuchel argues her trial counsel was constitutionally deficient because he engaged in the joint representation of Tuchel and B.M.[13]  To establish a Sixth Amendment violation based on a conflict of interest, "a defendant who did not raise an objection at trial must demonstrate by clear and convincing evidence that his or her counsel had an actual conflict of interest and that the actual conflict of interest adversely affected his or her lawyer's performance."  *State v. Street*, 202 Wis. 2d 533, 542, 551 N.W.2d 830 (Ct. App. 1996).

¶31    Tuchel has failed to demonstrate an actual conflict of interest, which is "competing loyalty that adversely affected [the client's] interests."  *State v. Medina*, 2006 WI App 76, ¶31, 292 Wis. 2d 453, 713 N.W.2d 172.  She offers only the conclusory assertion that trial counsel should have called B.M. to testify at Tuchel's trial "in ways that could have incriminated" B.M.  Yet Tuchel was charged as a party to a crime on nearly all the counts.[14]  Tuchel has not shown by clear and convincing evidence that implicating B.M. would not have harmed her own defense.  In fact, she offers nothing to suggest there was a meritorious basis to implicate B.M. in a way that was exculpatory as to Tuchel.

¶32    Also problematic for Tuchel is that she signed a waiver of any conflict arising from the joint representation.  "It is uncontested that a defendant may waive an actual or serious potential conflict of interest claim involving his or her attorney."  *State v. Cobbs*, 221 Wis. 2d 101, 105, 584 N.W.2d 709 (Ct. App.

---

[13]  Tuchel's and B.M.'s trials were severed.

[14]  Tuchel was initially charged with causing mental harm to a child as a party to a crime. That count was amended at trial by removing the party-to-a-crime theory of liability.

1998); *see also* **State v. Demmerly**, 2006 WI App 181, ¶15, 296 Wis. 2d 153, 722 N.W.2d 585. Tuchel complains that she was presented with a "one-page boiler plate waiver with no description of the specific conflict of interest issues of representing two defendants facing the same 38 charges." Yet even now, Tuchel fails to articulate what specific conflict issues might have existed that should have been discussed. And the circuit court agreed with the State's assertion that Tuchel was not credible in her assertions that she could not recall trial counsel discussing the conflict waiver or having her sign the document.

### B. Failure to Present Exculpatory Evidence

¶33 Tuchel next argues her trial counsel should have presented two types of exculpatory evidence. First, she argues that her trial counsel performed deficiently by failing to present evidence regarding J.M.'s assault on B.M., which she contends was necessary for the jury to understand "J.M., his personal motives, and [the] credibility of his testimony." Second, she argues her trial counsel failed to present exculpatory evidence that the dogs were in good health during an inspection in April 2017.

¶34 Tuchel has not established ineffective assistance of counsel as to either type of evidence. The trial record contains both J.M.'s and R.M.'s detailed testimony about the altercation between J.M. and B.M. that ultimately led J.M. to make his report to authorities. The record also contains trial counsel's cross-examination of Roeseler, during which questioning he acknowledged that during an April 3, 2017 inspection twenty-five dogs were observed in "okay" condition.[15]

---

[15] As the State notes, this testimony probably did not aid much in Tuchel's defense; law enforcement's observation of only twenty-five dogs in April 2017 somewhat corroborated J.M.'s assertion that they hid underfed and unhealthy dogs prior to inspection.

Because the evidence was actually presented at trial, there is no basis to conclude trial counsel performed deficiently.

### C. Failure to Object to J.M.'s Testimony Regarding "Razor"

¶35    Tuchel asserts her trial counsel should have objected to J.M.'s testimony that "Razor" died of malnourishment because his testimony was "not objectively believable." We declare evidence patently or inherently incredible only if it "conflicts with the laws of nature or with fully established or conceded facts," and then only in connection with a review of the sufficiency of the evidence to support a conviction. *See State v. Below*, 2011 WI App 64, ¶3, 333 Wis. 2d 690, 799 N.W.2d 95. Tuchel, in a remarkably brief argument, makes a remarkable ask: that we not only declare J.M.'s testimony inherently incredible, but that we declare Tuchel's trial counsel was constitutionally ineffective for failing to seek to exclude his testimony.

¶36    We see no reason in this case to depart from the typical rule of law that the trier of fact is the sole arbiter of witness credibility and alone is charged with the duty of weighing the evidence. *Id.*, ¶4. To demonstrate that J.M. was "not objectively believable" regarding the dogs that died of malnourishment, Tuchel asserts he "could not distinguish a 'boy' dog from a 'girl' dog." This is an exaggeration of J.M.'s testimony. J.M. did not say he was incapable of distinguishing male and female dogs; he testified he could not recall whether his favorite dog "Angel" was a "he" or a "she." R.M. testified that they had no dog named "Razor," but Tuchel provides no reason to believe R.M.'s testimony was inherently any more credible than J.M.'s.

¶37    Tuchel also complains that J.M. was not an expert and was incapable of determining the cause of death of a dog. She cites absolutely no law that

requires expert testimony to support a conviction under WIS. STAT. § 951.02, nor does she develop an argument that her trial counsel was constitutionally ineffective relating to the evidence supporting this charge. *See Pettit*, 171 Wis. 2d at 646. Moreover, we are highly skeptical of the premise of Tuchel's argument—that a lay person in J.M.'s circumstances as caregiver could not opine that a dog he had not adequately fed and watered had died of malnourishment.

### D. Failure to File a *Schiffra-Green* Motion Seeking J.M.'s Records

¶38 Tuchel contends her trial counsel should have sought out J.M.'s medical records. Tuchel claims these records might have provided fodder for cross-examination at trial, or else demonstrated that the State could not prove mental harm to J.M. To obtain in camera review of a victim's medical records, the defendant must show a "reasonable likelihood" that the records will be necessary to a determination of guilt or innocence. *State v. Green*, 2002 WI 68, ¶32, 253 Wis. 2d 356, 646 N.W.2d 298.

¶39 Here, Tuchel's claim fails on both performance and prejudice prongs. She does not address trial counsel's stated reasons for not pursuing the records; counsel testified the records had virtually no strategic value in light of the chosen defense, which was that a jury "who lived in a county that has a vibrant agricultural farm presence" would not view the idea of a child working on a farm—including disposing of deceased animals—as causing mental harm. Moreover, while we recognize that prejudice is a difficult area of inquiry as it relates to the potential contents of medical records, Tuchel has not even hinted that there is a reasonable probability of a different outcome even if the records contained no indication of mental harm to J.M.

18

### E. Other Assertions of Ineffective Assistance of Counsel

¶40    Tuchel makes several other assertions, including that her trial counsel was constitutionally ineffective for failing to seek to "disqualify" Heenan and the Sheboygan County District Attorney's Office for conflicts of interest, for failing to seek to exclude from trial the photos of the deceased dogs in the freezers, and for failing to object to the State's closing argument that not all the dogs in the freezer had died of "natural cause[s]."  We deem Tuchel's cursory arguments on these issues insufficiently developed and lacking in facial merit based on the arguments she does present.  *See **Pettit***, 171 Wis. 2d at 646.  We will not further address them.

### VI.  New Trial In the Interest of Justice

¶41    Finally, as Tuchel clarifies in her reply brief, she argues for an interest-of-justice reversal based upon all of the preceding issues.  As an initial matter, we note Tuchel relies on WIS. STAT. § 805.15(1), which is the interest-of-justice standard applicable to circuit courts.  Her arguments, however, appear directed to this court's power of discretionary reversal under WIS. STAT. § 752.35.  This is not merely a semantic difference; whereas we review circuit court determinations under § 805.15(1) using the highly discretionary erroneous-exercise-of-discretion standard, ***Priske v. General Motors Corp.***, 89 Wis. 2d 642, 662-63, 279 N.W.2d 227 (1979), we may exercise our discretionary reversal authority whenever it appears from the record that the real controversy has not been fully tried or where it is probable that justice has for any reason miscarried, *see* § 752.35.

¶42    Even construing Tuchel's arguments as directed to our independent power of discretionary reversal, we perceive no basis to exercise that authority

19

here. We use our discretionary reversal power sparingly and only in the most exceptional cases. ***State v. Klapps***, 2021 WI App 5, ¶31, 395 Wis. 2d 743, 954 N.W.2d 38. Having rejected all of Tuchel's arguments, we conclude this is not such a case.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.